SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DISTRICT OF COLUMBIA
441 4th Street, NW
Washington, D.C. 20001

Petitioner/Plaintiff,

v.

JEFFERSON-11TH STREET, LLC
1433 T Street, NW
Suite 10
Washington, D.C. 20009,

and

SCF MANAGEMENT, LLC
1433 T Street, NW
Suite 10
Washington, D.C. 20009,

and

STANLEY FORD, SR.
1433 T Street, NW
Suite 10
Washington, D.C. 20009,

and

ELLIS J. PARKER
2165 Ibis Isle Road
Apt. 9
Palm Beach, FL 33480 ,

Respondents/Defendants.

Civ. No.:

RECEIVED
Civil Clerk's Office
APR 24 2017
Superior Court
of the District of Columbia
Washington, D.C.

17-0002837

## PETITION FOR APPOINTMENT OF RECEIVER[1]

[1] This Petition for a receiver also includes a Complaint for injunctive and equitable relief under the District of Columbia's public nuisance law, 14 DCMR § 101 and claims under the District's Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.

The District of Columbia (the "District") files suit against Respondents/Defendants Jefferson-11th Street, LLC, SCF Management, LLC, Stanley Ford, Sr., and Ellis J. Parker (collectively, "Respondents"). The District seeks appointment of a receiver for 2724 11th Street, NW, Washington, D.C. 20001 ("the Property"), in accordance with the Tenant Receivership Act, D.C. Code §§ 42-3651.01 to -.08; abatement of a public nuisance pursuant to 14 DCMR § 101, and restitution, civil penalties, costs, attorney's fees and injunctive relief pursuant to the Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901, -3913. The District alleges as follows:

## PRELIMINARY STATEMENT

The Property is a rental housing accommodation located within the District of Columbia that comprises one building with a total of twenty-six rental units that Respondents own, operate, manage, lease and otherwise control.

The purpose of this action is to compel prompt abatement of violations of Chapters 1 through 16 of Title 14 of the DCMR ("housing code"), which threaten the health, safety, and security of the tenants; to seek injunctive relief, disgorge rental payments, assess penalties, and collect reasonable attorney's fees in costs for violations of the CPPA; and to deter such violations from occurring in the future.

When Respondents offered and leased the rental accommodations to their tenants, they represented that they would maintain the Property in accordance with the District of Columbia's laws and regulations, including the District's housing code. Instead, Respondents have "operated [the Property] in a manner that demonstrates a pattern of neglect" dating back many years. D.C. Code § 42-3651.02(b). The Property suffers from a multitude of recurring and continual code violations, including bedbug and rat infestation; inadequate heating and life safety facilities; and

building-wide mold contamination due to unidentified leaks. These conditions "pose[] a serious threat to the health, safety, or security of the tenants" and their families, including several minors. *Id.*

The unlawful and dangerous conditions at the Property are a direct result of the actions or omissions of the Respondents, jointly and severally. Respondents received specific and continuing notice from the tenants and the District of illegal conditions at the Property, and Respondents themselves have admitted that the Property is in a serious state of disrepair.

In 2012, Respondents began unpermitted demolition in the basement of the Property and petitioned for a zoning variance and a rent increase for purposes of redevelopment. As part of that process, Respondents testified under oath that the building has had significant problems since at least 2012. After failing to obtain the variance, Respondents abandoned the effort and subsequently ignored or outright refused to address tenant requests for necessary repairs in their units. Seeking another means of relief, tenants served Respondents with an administrative petition in July 2015 detailing unhealthy and unsafe conditions in each of the 15 occupied units. One year later, those problems remained unabated or had worsened: inspections by the D.C. Department of Consumer and Regulatory Affairs ("DCRA") on June 10 and 17, 2016 cited over 160 housing code violations at the Property, including many of the same issues raised in the tenants' petition.

The refusal of the Respondents to abate code violations at the Property is particularly egregious in light of the fact that the tenants have modest financial means, and therefore lack feasible alternatives to the unsafe and unhealthy rental accommodations inflicted upon them by the Respondents. Notwithstanding their refusal to maintain the Property, Respondents have consistently collected full rental payments for all of the affected units.

The unabated code violations at the Property and the overwhelming evidence of Respondents' pattern and practice of neglect are both grounds for the appointment of a Receiver under the Tenant Receivership Act, D.C. Code §§ 42-3651.01 to - .08. Respondents' failure to abate notices of violation for life, health, and safety concerns after 30 days also constitutes a public nuisance under to 14 DCMR § 101. Finally, Respondents' misrepresentations, both express and implied, that they would maintain the Property in a habitable manner and in accordance with the District's housing code constitute violations of the CPPA §§ 28-3904(a),(d),(e),(f), and (dd). Therefore, the District respectfully requests that this Court:

(1) Appoint a receiver who has demonstrated to the Court the expertise to develop and supervise a viable financial and repair plan for the satisfactory rehabilitation of the multi-unit rental housing accommodations which are the subject of this lawsuit;

(2) Order that the Respondents, jointly and severally, contribute funds in excess of the rents collected from the rental housing accommodation for the purposes of abating housing code violations and assuring that any conditions that are a serious threat to the health, safety, or security of the occupants or public are corrected pursuant to D.C. Code § 42-3651.05(f);

(3) Issue a Preliminary and/or Permanent Injunction Order ensuring the speedy abatement of the public nuisances at issue in this Complaint, including all outstanding housing code violations at the subject rental housing accommodation;

(4) Declare that the Property is maintained in a manner that is in violation of Title 14 of the District of Columbia Municipal Regulations and constitutes a danger to the health, welfare, or safety of the occupants and that said rental housing accommodations are a public nuisance;

(5) Award restitution against Respondents, jointly and severally, sufficient to disgorge the rent amount that were unlawfully charged tenants while the Property was uninhabitable, in violation of the District's housing code, and was deceptively offered and leased pursuant to D.C. Code § 28-3909(a);

(6) Award civil penalties against Respondents, jointly and severally, in an amount up to $1,000 per violation of the CPPA pursuant to D.C. Code § 28-3909(b);

(7) Enter injunctive relief requiring Defendants to cease and desist committing any unlawful trade practices that violate the CPPA pursuant to D.C. Code § 28-3909(a);

(8) Award all allowable costs;

(9) Award reasonable attorney's fees pursuant to D.C. Code § 28-3909(b); and

(10) Provide any other relief deemed appropriate by the Court.

## I. JURISDICTION

1. The Court has subject matter jurisdiction pursuant to D.C. Code § 11-921 and § 28-3909.

2. The Court has personal jurisdiction pursuant to D.C. Code § 13-423.

## II. PARTIES

3. Petitioner/Plaintiff, the District of Columbia, is a municipal corporation created under the laws of the United States and is capable of suing and being sued pursuant to D.C. Code § 1-102.

4. Respondent/Defendant Jefferson-11th Street, LLC ("Jefferson-11th Street"), is a limited liability company operating in the District of Columbia and organized under the laws of the state of Delaware. Since November 17, 2009, Jefferson-11th Street has held legal title to the Property. Jefferson-11th Street has its principal place of business at 1433 T Street, NW, Suite

101, Washington, D.C. 20009. Respondent/Defendant Ellis J. Parker is the managing member of Jefferson-11th Street, and is also its alter ego. Ellis J. Parker executed the deed for the Property on November 17, 2009, as a "managing member" of Jefferson-11th Street. At all times material to this Petition, acting alone or in concert with others, Respondent/Defendant Ellis J. Parker formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved of the acts or practices of Jefferson-11th Street, including the acts and practices set forth in this Petition. On information and belief, Respondent/Defendant Ellis J. Parker resides in Potomac, Maryland and Palm Beach, Florida.

5. The other members of Jefferson-11th Street are Respondent/Defendant Ellis J. Parker's wife, Nancy B. Parker, and on information and belief, his children. Members of the Parker family have owned the Property for more than 50 years under the names of different corporate entities and family members. On information and belief, Jefferson-11th Street was incorporated as a limited liability company in 2006 and exists solely to own and operate the Property.

6. Respondent/Defendant Stanley Ford Sr. has managed the Property since at least 2012. From 2012 to 2014, Mr. Ford was an employee of the Barac Company. In 2014, Mr. Ford left Barac and founded his own company, SCF Management, LLC ("SCF Management"). At all times material to this Petition, acting alone or in concert with others, Respondent/Defendant Stanley Ford Sr. formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved of the acts or practices of SCF Management, including the acts and practices set forth in this Petition.

7. Respondent/Defendant SCF Management is a limited liability company organized under the laws of the state of Maryland and maintains a principal place of business at 11204

Bybee Street, Silver Spring, MD 20902. SCF Management is also responsible for managing the Property

## III. FACTS

8. The Property is a two-floor brick apartment building with twenty-six units and a basement. *See* Ex. 25, Pet. for Substantial Rehabilitation, Case No. 2016-DHCD-SR 20,129 at 11 (O.A.H.D.C. Mar. 2016). Tenants currently occupy fifteen units within the building. *See id.*

9. The current tenants have all resided in the Property since Respondent/Defendant Jefferson-11th Street LLC took title in 2009. *See* Ex. 26, Deed. All seven tenants whose affidavits are attached to this Petition have lived at the Property for over ten years. Three of those tenants – Marcelina Benitez, Magdaleno Benitez, and Rosetta Archie – have lived at the Property for more than twenty years.

10. The tenants all have leases with Respondent/Defendant Jefferson-11th St LLC and pay their rent to Respondent/Defendant SCF Management. *See* Exs. 1-6, Tenant Affidavits. *See also* Ex. 4, Aff. of Dolores Martinez, ¶13 ("we have always paid our rent on time"); Ex. 5, Aff. of Magdaleno Benitez, ¶15 ("I always pay my rent on time").

11. The Property suffers from a multitude of unsafe and unsanitary conditions that have been ongoing for the past decade and violate the housing code. For example:

12. Mice, rats, bedbugs, and roaches have infested the building. *See, e.g.*, Ex. 1, Aff. of Ana Vasquez ¶4 ("I ruined several brooms chasing and hitting rats"); Ex. 2, Aff. of Marcelina Benitez, ¶7 ("I have roaches [and] little rats frequently come out from behind the stove"); Ex. 3, Aff. of Rosetta Archie, ¶7 ("I have mice, roaches, and centipedes"); Ex 4, Aff. of Dolores Martinez, ¶10 ("We have bedbugs, mice, and roaches. Management sprays sometimes, but we don't know for sure what they are spraying, because it never kills anything."); Ex. 5, Affidavit of

Magdaleno Benitez (stating that she has experienced "constant infestations of bedbugs, mice and/or rats, and roaches" since moving in to the Property in 2003). Tenants frequently see and try to kill the bedbugs, leaving behind welted skin and blood stains on the walls. *See, e.g.*, Ex. 1, Aff. of Ana Vasquez ¶4; Ex. 22, Photo000008; Ex. 23, Photo000015; and Ex. 24, Photo000029.

13. Heating and electrical systems periodically fail, sometimes leaving tenants without these basic amenities for long periods. *See, e.g.*, Ex. 1, Aff. of Ana Vasquez, ¶6 ("The longest we were ever without power is three days"); Ex. 3, Aff. of Rosetta Archie, ¶8 ("The heat that the building supplies is inconsistent. [...] I have gone without heat for an entire week."); Ex. 4, Aff. of Dolores Martinez, ¶12 ("Sometimes sparks shoot out of the electric box by the entrance way"); Ex. 5, Aff. of Magdaleno Benitez, ¶12 (stating that the heat in his apartment has been broken since his daughter was born three years ago). The rodents that infest the building exacerbate these problems by chewing through wiring in the units. *Id.* at ¶9 ("I know it is the bigger [rodents] that are always eating through my electrical wires").

14. Leaks in the building's roof and plumbing systems have caused water infiltration in the occupied units and common areas of the building. *See, e.g.*, Ex. 1, Aff. of Ana Vasquez at ¶5 ("There are leaks when it rains and this has been an ongoing problem for a long time. They keep saying it's fixed but it keeps leaking."); Ex. 4, Aff. of Dolores Martinez at ¶11 (describing leaks in her apartment); Ex. 5, Aff. of Magdaleno Benitez ¶6 ("there is water that leaks in through the skylight").

15. The water infiltration has damaged the interior structures and has caused ceilings, bathtubs, and sinks to collapse. *See, e.g.*, Ex. 3, Aff. of Rosetta Archie at ¶9 (describing multiple ceiling collapses from water damage); Ex. 5, Aff. of Magdaleno Benitez ¶13 (describing water damage inside the closet of his apartment).

16. The moisture from the leaks has also led to extensive and recurring indoor mold contamination. *See*, *e.g.*, Ex. 1, Aff. of Ana Vasquez at ¶8 ("We have problems with mold. [Workers] came on Thursday to clean and paint the mold in the bedroom; on Sunday, the water stains are beginning to show again through the paint.")[2].

17. According to Vincent Ford, former chief building inspector for DCRA, "unless the building's roof is either replaced or fully repaired, water will continue to flow into the building from outside, which will cause water damage and other moisture build-up to ceilings and walls." Ex. 8, Aff. of Vincent Ford, ¶5.

18. Respondents routinely ignore tenants' requests for repairs. When tenants call phone numbers supplied by the Respondents for maintenance and emergency repair issues and leave messages they are unanswered. *See*, *e.g.*, Ex. 1, Aff. of Ana Vasques at ¶5 ("We try to call the office but they never answer the phone."); Ex. 2, Aff. of Marcelina Benitez at ¶4 ("If you call to report a problem in your unit, they do not care and are not interested"); Ex. 3, Aff. of Rosetta Archie at ¶4 ("Every time I bring [repair issues] up to Mr. Ford, he says he will have someone [make the repairs], but no one ever shows up to do any work."); Ex. 4, Aff. of Dolores Martinez, at ¶6 ("The management is slow to make repairs….Sometimes, they don't respond to me at all no matter the amount of times I call.").

19. When management does respond to requests, the resulting work is superficial and incomplete. Respondents paint and plaster over leaks and mold, but allow the underlying problems to continue. In Unit 32, for example, water leaks caused the ceiling to cave in on November 30, 2016. Respondents sent workers to plaster the collapsed portion but failed to fix

---

[2] On November 8, 2016, the tenants filed civil action, 2016 CA 008084 B, against Jefferson-11th Street, LLC and Ellis Parker. The tenants allege that the defendants knew, or should have known, about the presence of indoor mold contamination, in five units within the building, and failed to permanently remedy the problem, thus breaching the implied warranty of habitability and D.C. Code § 8-241.04.

the leak, and the ceiling caved in again twice more, causing significant damage to the tenant's belongings. Ex. 3, Aff. of Rosetta Archie ¶9; Ex. 23, Photo00016-18, Photographs of Ms. Archie's ceiling on March 31, 2017. ¶_; *See also* Ex. 8, Aff. of Vincent Ford, ¶9 ("In some locations the water-damaged ceilings and walls were patched, painted over, or otherwise treated in a manner that may conceal the full nature and extent of the water damage.").

20. Respondents' agents have told tenants that they do not have sufficient money for repairs or even for enough paint to cover the walls. In Unit 5, workers painted over water damage, and around furniture, but told the tenants they could not afford to expend the paint to give the entire wall a fresh coat. Ex. 2, Aff. of Marcelina Benitez at ¶4 and Ex. 5, Aff. of Magdaleno Benitez at ¶14.

21. In some cases, the attempts to paint over issues have caused potential hazards, such as in Unit 6, where "the stove was once spray painted to appear to look new….when the stove was used, the fumes from the spray paint would fill the unit." Ex. 7, Aff. of Casey Watson, at ¶10.

22. Despite the conditions of the Property, the tenants cannot move because they have limited means and are unable to find other affordable alternatives. *See, e.g.*, Ex. 1, Aff. of Ana Vasquez, at ¶12 ("I don't like moving around. We can afford this building and there aren't really other options."); Ex. 2, Aff. of Marcelina Benitez, at ¶11 ("I can't move because I am very sick. I don't have the health, time, or money to move from my home of over 20 years"); Ex. 6, Aff. of Rigoberto Ramos at ¶10 ("It is difficult to find apartments of reasonable rent in that area").

23. Many of the tenants also feel attached to the neighborhood. As tenant Rosetta Archie explains: "My son grew up here….I can get to my doctors, business appointments, the grocery store, the bus line; everything is convenient. I am comfortable. I want to stay because

this is what I can afford and we shouldn't be pushed out because someone wants to tear down the building and make more money." Ex. 3, Aff. of Rosetta Archie, at ¶12.

### A. Zoning Application

24. Tenants report that conditions at the Property have become particularly unbearable since 2014. The reported increase in problems began around the same time that the building management abandoned a planned renovation and rent increase at the Property.

25. On information and belief, the Respondents began demolition in the basement of the Property sometime in 2012. At some point, Respondents ceased construction and left the basement full of debris and with well holes in the flooring and ceiling. The work in the basement caused increased presence of rats and mice in the occupied units. *See* Ex. 1, Aff. of Ana Vasquez, at ¶4 ("When management busted up the basement..[t]hat's when the big rats came in to my unit"); *See also* Ex. 11, Transcript of November 18, 2014 Zoning Hearing at 93 (Hereinafter "Zoning Hearing") (Jennifer Parker, the daughter-in-law of Ellis J. Parker, stating that they "had a building permit to dig up the basement from our builder. That will stir up rats, yes, it does").

26. On September 14, 2014, Respondent/Defendant Jefferson-11th Street filed an administrative petition requesting authorization to increase the tenants' rent.

27. On April 24, 2014, Jefferson-11th Street applied for a variance ("Variance Request") from the Board of Zoning Adjustment ("the Board") to create eight market-rate residential units in the basement of the Property.

28. On November 18, 2014, the Board heard testimony in support of the Variance Request, including testimony from Respondent/Defendant Stanley C. Ford Sr.; Jennifer Parker, the daughter-in-law of Ellis J. Parker, and former counsel for the owner.

29. During the hearing, Ms. Parker acknowledged that "the building is in disrepair" and "needed some repairs several years ago." *See* Ex. 11, Zoning Hearing at 92. Ms. Parker assured the Board that the owner would provide the current tenants with new units. *See id.* at 90.

30. On January 13, 2015, the Board denied Respondent/Defendant Jefferson-11th Street's application. At the application hearing, Board Vice-Chair Allen expressed the hope that "current ownership…still intends to make good on their promises to the tenants" to provide them with renovated apartments. *See* Ex. 12, Transcript of January 13, 2014 Hearing p. 14, lines 22-24). Soon thereafter, Jefferson-11th Street, withdrew its administrative petition.

**B. Tenants' Association Administrative Hearing**

31. Following the withdrawal of their administrative petition, Respondents continued to ignore tenants' requests to remediate the deteriorating conditions.

32. On April 17, 2015, the Latino Economic Development Coalition sent a letter on behalf of the tenants to Jennifer Parker and Stanley Ford Sr. listing conditions requiring abatement within 16 individual units, including: lack of heat; insufficient ventilation; infestation of bed bugs, mice, roaches, and rats; mold; peeling paint; missing baseboards; and leaky ceilings. Ex. 13, April 17, 2015 Tenant Letter ("April Letter").

33. On June 10, 2015, Tenants sent a second letter to Respondents detailing unsafe and unsanitary conditions in the common areas of the Property. Ex. 14, June 10, 2015 Tenant Letter ("June Letter").

34. The Respondents did not correct any of the conditions described in the April Letter or the June Letter.

35. On July 2, 2015, the tenants filed an administrative petition with the Office of Administrative Hearings ("OAH") seeking relief from the unhealthy and unsafe conditions in

fifteen of the occupied units. The evidentiary hearing on the petition was held from February 2, 2016, through May 20, 2016.

36. In the course of the OAH hearing, the owner and its agents admitted that the building was "in need of major renovation, including a new roof, new boiler, and new walls." *See* Ex. 21 at Tr. Day 10, 13:8-10 (O.A.H.D.C. Aug. 9, 2016) (Stanley Ford Sr. testifying that, "We know that the piping still has to be replaced and underground. We know that the roof has to be replaced....The plaster is 80, 90 years old and....it's at the end...its [the] point where it does need to be replaced"). *See id.* at Tr. Day 10, 47:8-20.

## IV. Landlord Substantial Rehabilitation Petition

37. In March 2016, Respondent/Defendant Jefferson-11th Street filed an administrative Petition for Substantial Rehabilitation that sought to increase the tenants' rent in order to rehabilitate the Property. *See* Ex, 25, Pet. for Substantial Rehabilitation, at 20 and Proposed Rent Adjustment Schedule: Pre-Rehabilitation.

38. Within the Petition, Respondents admitted the Property requires extensive rehabilitation, noting that such rehabilitation would "protect or enhance the health, safety, and security of the tenants," and that "the major building systems and materials in the [Property] have deteriorated, become antiquated and no longer...perform to the specifications required for modern end-user equipment and services." *Id.* at 14.

39. Respondents also conceded that "[t]he existing plumbing system continues to deteriorate, which increases the potential for leaks and clogged passage ways. The existing electrical system contains wiring that struggles to perform to the level required for regular household appliances, and is inefficient to perform for the installation of new, larger appliances,"

*Id.* at 15; that there is debris in the basement; and that the residential units and roof require full demolition and reconstruction. *Id.* at 20.

## V. <u>June 2016 DCRA Housing Inspection</u>

40. DCRA conducted a property-wide inspection at the Property on June 10, 2016 and June 17, 2016 ("June 2016 Inspection"). *See* Exs. 15 and 16. Over the course of those two days, DCRA inspected the exterior and common areas of the Property and the interiors of fifteen occupied units.

41. As a result of the June 2016 Inspection, DCRA cited 163 housing code violations at the Property. *See id.* Eighty (80) of the violations cited constitute a serious threat to the life, health, and safety of the residents. These include: lack of heat and ventilation; infestation of mice, roaches, and bed bugs; and defective smoke detectors.

42. DCRA cited the Property for numerous instances of leaks and dampness on interior walls. In each instance, DCRA specifically directed Respondent/Defendant Jefferson-11th Street to "locate the source of the water leak, repair the leak and repair or replace wall for dampness." *See, e.g.,* Ex. 15, Notice of Violation for Unit 11.

43. DCRA cited Respondent/Defendant Jefferson-11th Street for numerous additional quality of life violations at the Property, including: failure to maintain the bathtub, sink, oven, and stove; loose or peeling paint; holes in the ceilings, floors, and walls of the units; and defective hardware on doors.

44. On June 14 and 21, 2016, Inspector Michael Jenkins served Jefferson-11th Street LLC via First Class Mail with copies of all Notices of Violation for 2724 11th Street, NW issued as a result of the June 2016 Inspections. *See* Exs. 17-18, Notices of Infraction and Ex. 19 DCRA

Extension Requests. The Notices of Violation were also emailed to Respondent/Defendant Stanley Ford Sr. at SCFManagement@hotmail.com. *See id.*

45. DCRA provided Respondents with thirty days to abate the housing code violations listed on the Notices of Violation. Respondents sent two letters requesting an extension to remediate the violations, which DCRA approved. *See* Ex. 19.

46. DCRA re-inspected the violations on September 13, 2016 and September 21, 2016, approximately ninety days after the initial inspection. *See* Exs. 17 and 18.

47. During the re-inspections, DCRA inspectors found that 36 violations of the housing code remained unabated. *See id.*

48. Of those, 15 constitute a serious threat to the life, health, and safety of the residents, including: failure of the owner to eliminate an infestation of roaches, bed-bugs, or other type of vermin; loose or peeling paint; a defective stove and oven; a rotting window frame; an unclean bathtub; and failure to provide or maintain a bathtub.

49. As of the date of this filing, the most egregious violations in the Property remain uncorrected, including unchecked rodent and insect infestation; building-wide mold contamination; leaks in the roof and interior plumbing; and failure to provide basic heating and plumbing facilities. *See* Exs. 1-8.

## VI. STATUTORY BASIS FOR APPOINTMENT OF RECEIVER

50. In accordance with D.C. Code § 42-3651.03, the Attorney General for the District of Columbia, in the name of the District of Columbia, may petition the Court to appoint a receiver of the rents or payments for use and occupancy for a rental housing accommodation when "a rental housing accommodation has been cited by [DCRA] for a violation of chapters 1 through 16 of Title 14 of the District of Columbia Municipal Regulations. . . [and that] violation

poses a serious threat to the health, safety, or security of the tenant. . . ." D.C. Code § 42-3651.02(a)(1).

51. A receiver may also be appointed if "a rental housing accommodation has been operated in a manner that demonstrates a pattern of neglect for the property for a period of thirty consecutive days and such neglect poses a serious threat to the health, safety, or security of the tenants." D.C. Code § 42-3651.02(b).

52. The term "pattern of neglect" includes "all evidence that the owner, agent, lessor, or manager of the rental housing accommodation has maintained the premises in a serious state of disrepair, including vermin or rat infestation, filth or contamination, inadequate ventilation, illumination, sanitary, heating or life safety facilities, inoperative fire suppression or warning equipment, or any other condition that constitutes a hazard to its occupants or to the public." *Id.* A notice of violation issued by DCRA is not required to demonstrate a pattern of neglect or to otherwise establish the basis for appointment of a receiver. D.C. Code § 42-3651.02(b)

53. "The housing code is a general guideline designed to prohibit dilapidation, inadequate maintenance . . . inadequate toilet facilities, inadequate bathing or washing facilities, inadequate heating, insufficient protection against fire hazards, inadequate lighting and ventilation, unsafe construction, and other unsanitary or unsafe conditions." Comm. Rep., B17-0729, Abatement of Nuisance Properties and Tenant Amendment Act of 2008, at 2 (Nov. 14, 2008) [hereinafter "Committee Report"]. The D.C. Council enacted D.C. Code § 42-3651.02(b) to protect tenants in instances where the landlord has refused to abate those conditions and DCRA has been unable to compel such abatement. As stated in the 2008 Committee Report recommending adoption of the legislation:

> Despite the existence of an inspections process, many tenants live in unsanitary and unsafe conditions without meaningful options for

> remedies. For example, reports abound of tenants living in housing units infested with vermin, of children developing respiratory problems caused by mold buildup, and of people living without heat or hot water. In the absence of a meaningful remedy, tenants are typically confronted with an impossible choice: persist in unsanitary conditions or move out. Disturbingly, some landlords have used the lack of a meaningful remedy to their advantage. Recently, the *Washington Post* reported that some landlords purposely neglected apartment units in the hope that conditions would become so intolerable that tenants would be forced to vacate their homes. Once vacant, buildings command higher prices on the market because they are more easily converted to lucrative condominiums.

Committee Report, at 4.

**COUNT I**
**(Petition for Appointment of a Receiver for 2724 11th Street, NW)**

54. The District incorporates by reference paragraphs 1 through 53.

55. Respondents' failure to abate DCRA citations for housing code violations that pose a serious threat to the health, safety, or security of the tenants is grounds for appointment of a Receiver. D.C. Code § 42-3651.02(b). On June 17, 2016, DCRA issued Notices of Violation to Respondents citing 163 violations at the Property, including 80 serious life, health, and safety risks. Those Notices of Violation gave Respondents 30 days to abate the violations. 90 days later, DCRA inspected the Property again and found that 36 total violations remained unabated, including 15 serious life, health, and safety risks.

56. Respondents have also operated the Property in a manner that demonstrates a pattern of neglect under D.C. Code § 42-3651.02(b). The Property is "in a serious state of disrepair" and suffers from every one of the signs of neglect listed in the statute, including "vermin or rat infestation, filth or contamination, inadequate ventilation, illumination, sanitary,

heating or life safety facilities, [and] inoperative fire suppression or warning equipment," *id.*, as well as structural damage and widespread mold caused by leaks.

57. Respondents have allowed the Property to deteriorate over a period of years, well beyond the statutory period of thirty (30) consecutive days, despite having full knowledge of the unlawful conditions and their effect on the tenants. Respondents ignored, or even refused to listen to, tenant requests for repairs. They solicited professional advice but failed to follow through. Instead of repairing major issues, Respondents painted over them; even then, Respondents refused to expend the paint beyond what was necessary to cover the affected areas.

58. D.C. Code § 42-3651.02(b) is intended to address precisely the type of conditions that exist at the Property. Respondents' pattern of neglect—despite countless DCRA citations and re-inspections, and litigation resulting from the Tenant Petition—plus Respondents' affirmative statements that they will not abate the most fundamental and significant conditions until and unless tenants pay large rent increases, demonstrate that Respondents are knowingly unwilling and incapable of undertaking the necessary actions to abate and eliminate these unhealthy and unsafe conditions.

**COUNT II**
**(Request for Preliminary and/or Permanent Injunction of a Public Nuisance)**

59. The District incorporates by reference paragraphs 1 through 58.

60. The maintenance of rental housing accommodations in violation of the provisions of Title 14 of the District of Columbia Municipal Regulations, where those violations constitute a danger to the health, welfare or safety of the occupants, is a public nuisance. *See* 14 DCMR § 101.1.

61. Respondents have created a public nuisance by repeatedly violating Title 14 of the District of Columbia Municipal Regulations when they failed to maintain the Property, thereby

creating an immediate risk of harm to the health, welfare, or safety of their tenants.

62. The District of Columbia has standing to sue to abate a public nuisance. *See* 14 DCMR § 100.3.

63. The purpose of Title 14 to declare expressly a public nuisance in favor of speedy abatement of the public nuisance, if necessary, by preliminary and permanent injunction. *See* 14 DCMR § 101.5.

64. Respondents' ongoing and continuing failure to abate the numerous housing code violations found within the Property demonstrates that the housing code violations will remain unabated unless the court grants injunctive relief requiring Respondents to abate the public nuisances.

**COUNT III**
**(Violations of the Consumer Protection Procedures Act)**

65. The District incorporates by reference paragraphs 1 through 64.

66. The District of Columbia Consumer Protection Procedures Act ("CPPA") prohibits unlawful trade practices in connection with the offer, lease and supplying of consumer goods and services. D.C. Code § 28-3901(a)(6). The CPPA defines consumer goods and services to include "real estate transactions." D.C. Code § 28-3901(a)(7).

67. The tenants in the Property are consumers because they rented their units in the Property for personal, household, or family purposes. D.C. Code §28-3901(a)(2).

68. Respondents, in the ordinary course of business, offer to lease or supply consumer goods and services and, therefore, are merchants under the CPPA. D.C. Code § 28-3901(a)(3).

69. The CPPA authorizes the Attorney General to file suit against any person the Attorney General has reason to believe "is using or intends to use any method, act, or practice

[that is an unlawful trade practice] in violation of ... D.C. Code § 38-3904." D.C. Code § 28-3909(a).

70. Under the CPPA, it is an unlawful trade practice for any person to:

> (a) represent that goods or services have a source, sponsorship, approval, certification, or connection that they do not have;
>
> * * *
>
> (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;
>
> (e) misrepresent as to a material fact which has a tendency to mislead; [or]
>
> (f) fail to state a material fact if such failure tends to mislead [....]

D.C. Code § 28-3904.

71. Here, Respondents committed unlawful trade practices under the CPPA when they:

a. expressly and implicitly represented to tenants/consumers that the units Respondents offered to lease and did lease are or would be brought into compliance with the District's laws and regulations (including the District's housing code) when, in fact, the units were not habitable and were not maintained in a manner consistent with the District's laws and regulations;

b. expressly and implicitly represented to tenants/consumers that the Property was habitable and would be maintained in compliance the District's laws and regulations (including the District's housing code) when, in fact, the Property is not habitable and Respondents have not maintained the Property in a manner consistent with the District's laws and regulations;

c. expressly and implicitly represented to tenants/consumers that Respondents have abated or will abate all housing code violations and any other material defects that pose a serious threat to the health, safety, or security of the tenants/consumers when, in fact, Respondents have not done so; and

d. collected rent from tenants/consumers while failing to inform them that Respondents would continuously and systematically fail to maintain the Property in a habitable condition.

72. Respondents' misrepresentations and material omissions of fact both had the capacity and tendency to mislead consumers in violation of §28-3904(a), (d), (e) and (f) of the CPPA.

73. Respondents' failure to abate the numerous housing code violations found within their buildings constitute violations of 16 DCMR § 3305. Such violations are also unlawful trade practices that violate § 28-3904(dd) of the CPPA.

74. Tenants/consumers in the District have suffered substantial injury as a result of Respondents' violations of the CPPA. In particular, tenants/consumers have paid, and continue to pay, full rent to Respondents while being forced to live in apartments with substantial housing code violations. Respondents have continued to collect full rent payments from tenants/consumers despite Respondents' false representations, misrepresentations, and material omissions about the conditions of the Property and their willingness to maintain it. As such, Respondents have been unjustly enriched by their unlawful acts or practices.

75. Where the Attorney General establishes a violation of the CPPA, the Court may, among other relief, award "restitution for property lost or damages suffered," issue a temporary or permanent injunction against the use of the unlawful "method act or practice," and award "a civil penalty of not more than $1,000 for each violation, the costs of the action, and reasonable attorney's fees." D.C. Code § 28-3909(a)-(b).

76. Respondent/Defendant Ellis J. Parker is personally liable under the CPPA because he possessed and/or exercised the authority to control the policies and trade practices of Respondent/Defendant Jefferson-11th Street, LLC; was responsible for creating and implementing the alleged deceptive policies and trade practices of Respondent/Defendant Jefferson-11th Street, LLC that are described herein; participated in the alleged deceptive trade

practices that are described herein; directed or supervised those employees of Respondent/Defendant Jefferson-11th Street, LLC who participated in the alleged deceptive trade practices that are described herein; and knew or should have known of the deceptive trade practices that are described herein and had the power to stop them, but rather than stopping them, promoted their use.

77. Respondent/Defendant Stanley Ford, Sr. is personally liable under the CPPA because he possessed and/or exercised the authority to control the policies and trade practices of Respondent/Defendant SCF Management, LLC; was responsible for creating and implementing the alleged deceptive policies and trade practices of Respondent/Defendant SCF Management, LLC that are described herein; participated in the alleged deceptive trade practices that are described herein; directed or supervised those employees of Respondent/Defendant SCF Management, LLC who participated in the alleged deceptive trade practices that are described herein; and knew or should have known of the deceptive trade practices that are described herein and had the power to stop them, but rather than stopping them, promoted their use.

## RELIEF REQUESTED

Wherefore, Petitioner/Plaintiff, the District of Columbia, respectfully requests that the Court:

(a) Appoint a receiver who has demonstrated to the Court the expertise to develop and supervise a viable financial and repair plan for the satisfactory rehabilitation of the multi-unit rental housing accommodations which are the subject of this lawsuit;

(b) Order that the Respondents, jointly and severally, contribute funds in excess of the rents collected from the rental housing accommodation for the purposes of abating housing code violations and assuring that any conditions that are a serious threat to the health,

safety, or security of the occupants or public are corrected, pursuant to D.C. Code § 42-3651.05(f);

(c) Issue a Preliminary and/or Permanent Injunction Order ensuring the speedy abatement of the public nuisances at issue in this Complaint, including all outstanding housing code violations at the subject rental housing accommodation;

(d) Declare that the Property is maintained in a manner that is in violation of Title 14 of the District of Columbia Municipal Regulations and constitutes a danger to the health, welfare, or safety of the occupants and that said rental housing accommodations are a public nuisance;

(e) Award restitution against Respondents, jointly and severally, sufficient to disgorge the rent amount that were unlawfully charged tenants while the Property was uninhabitable, in violation of the District's housing code, and was deceptively offered and leased pursuant to D.C. Code § 28-3909(a);

(f) Award civil penalties against Respondents, jointly and severally, in an amount up to $1,000 per violation of the CPPA pursuant to D.C. Code § 28-3909(b);

(g) Enter injunctive relief requiring Respondents to cease and desist committing any unlawful trade practices that violate the CPPA pursuant to D.C. Code § 28-3909(a);

(h) Award all allowable costs;

(i) Award reasonable attorney's fees pursuant to D.C. Code § 28-3909(b); and

(j) Provide any other relief deemed appropriate by the Court.

Dated: April 24, 2017

Respectfully Submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ROBYN BENDER
Deputy Attorney General, Public Advocacy Division

PHILIP ZIPERMAN
Director, Office of Consumer Protection

JIMMY R. ROCK
Deputy Director, Office of Consumer Protection

*/s/ Jane Lewis*
JANE LEWIS*
Chief, Housing and Community Justice Section

*/s/ Stacy Jeremiah*
STACY JEREMIAH
Assistant Attorney General
Bar No. 1024942
441 4th Street, NW
Suite 1060 North
Washington, D.C. 20001
(202) 727-4171 (phone)
(202) 741-8984 (fax)
Email: Stacy.Jeremiah@dc.gov

*/s/Benjamin Wiseman*
BENJAMIN WISEMAN
Assistant Attorney General
Bar No. 1005442
441 4th Street, NW
Suite 600-S
Washington, D.C. 20001
(202) 741-5226 (phone)
(202) 741-8949 (e-fax)
Email: Benjamin.Wiseman@dc.gov

*Attorneys for the District of Columbia*

* Practicing in the District of Columbia pursuant to Ct. App. R. 49(c)(4) and under the supervision of a member of the D.C. Bar.